[Cite as *Arndt v. P&M Ltd.*, 2014-Ohio-3076.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| CHRIS ARNDT, et al., | : | **O P I N I O N** |
| Plaintiffs-Appellants/ Cross-Appellees, | : | |
| | : | **CASE NO. 2013-P-0027** |
| - vs - | : | |
| P & M LTD (d.b.a. P & M ESTATES), et al., | : | |
| Defendants-Appellees/ Cross-Appellants. | : | |
| | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2010 CV 01810.

Judgment: Affirmed.

*George W. Cochran,* 1385 Russell Drive, Streetsboro, OH 44241 and *Eric R. Fink,* 217 North Water Street, Kent, OH 44240 (For Plaintiffs-Appellants/Cross-Appellees).

*John T. Murphy, Richard C.O. Rezie* and *Leah M. Hohenberger,* Gallagher Sharp, Sixth Floor, Bulkley Building, 1501 Euclid Avenue, Cleveland, OH 44115 (For Defendants-Appellees/Cross Appellants).

DIANE V. GRENDELL, J.

{¶1} Plaintiffs-appellants/cross-appellees appeal various Judgments and Orders of the Portage County Court of Common Pleas, entering judgment in favor of defendants-appellees/cross-appellants following a jury trial. Defendants-appellees/cross-appellants appeal the same court's decision not to impose sanctions on

the plaintiffs-appellants/cross-appellees for frivolous conduct. The issues before this court are: (1) whether a trial court properly limits a party's voir dire of prospective jurors and submits jury interrogatories to forestall that party from representing to the jury, contrary to the law of the case, that the defendant's violation of a statutory duty constitutes negligence per se; (2) whether a trial court's denial of a party's motion for summary judgment may constitute error when a jury has subsequently found in favor of the non-moving party; (3) whether a trial court may direct a verdict against parties which have failed to identify their claims in bankruptcy proceedings and/or have failed to appear for trial; (4) whether a trial court errs by refusing to grant a party's request to present rebuttal testimony in response to a witness who was duly identified as a witness prior to trial; (5) whether a trial court errs by denying a motion for judgment notwithstanding the verdict based on a theory of the case contrary to the law of the case as pronounced by a superior court; (6) whether a trial court errs by failing to allow separate trials where one of the plaintiffs' credibility has been severely compromised; (7) whether a trial court may properly deny, without further investigation, a motion for mistrial/new trial based on allegations of juror misconduct that are unsubstantiated; and (8) whether a trial court may choose not to award sanctions where certain parties have falsely attested to, spoliated, and otherwise concealed evidence. For the following reasons, we affirm the decision of the court below.

{¶2} On November 24, 2010, Chris Arndt, Doug and Denise Bly, James Manges, Patricia Manges, Jason and Darlene DeBolt, Dianne, Dusty and David Lough, Dusty M. Wolfe, Darlene Stanley, Robert and Denise Wilcox, and Paul J. Kellar filed a Complaint in the Portage County Court of Common Pleas against P&M Ltd. (d.b.a. P&M Estates), Modern Management Solutions, LLC, Raymond Vehovec, and KMV V, Ltd.

2

{¶3} According to the Complaint, the plaintiffs were residents of P&M Mobile Home Park of Garrettsville, Ohio, and the defendants were owners and/or operators of the manufactured (mobile) home park.

{¶4} On January 28, 2011, the defendants filed their Answer to Plaintiffs' Complaint.

{¶5} On November 18, 2011, the plaintiffs filed an Amended Complaint, which contained three claims for relief: Property Damage Claims for Statutory Violations of Operator Obligations (Count One); Fraudulent Concealment (Count Two); and Punitive Damages (Count Three).

{¶6} On December 8, 2011, the defendants filed their Answer to the Amended Complaint.

{¶7} On April 27, 2012, the plaintiffs filed a Motion for Partial Summary Judgment (Breach of Statutory Duty to Prevent Recurrent Flooding), seeking "to establish that Defendants breached their statutory duty to prevent recurrent flooding as a matter of law."

{¶8} On June 28, 2012, the plaintiffs filed a Motion for Separate Trial of DeBolt Claims (and Hearing Thereon) pursuant to Rule 42(B).

{¶9} On August 1, 2012, the trial court issued an Order, adding Bankruptcy Trustee, Harold Corzin, as a party plaintiff, and denying plaintiffs' Motion for Separate Trial of DeBolt Claims.

{¶10} On October 9, 2012, the defendants filed a Motion for Dismissal and Sanctions.

{¶11} On November 14, 2012, the trial court issued an Order, denying the plaintiffs' Motion for Partial Summary Judgment and the defendants' Motion for Dismissal and Sanctions.

{¶12} Between January 8 and January 17, 2013, a trial on the merits of plaintiffs' claims was held. The plaintiffs presented testimony from the following witnesses in support of their case:

{¶13} Plaintiff, Chris Arndt, testified that he was a resident of P&M Estates between 1998 and 2004. Arndt purchased a home for approximately $7,700 and leased a lot on North Chapel Street. Arndt's lot was situated on the north side of Mahoning Creek[1], which runs from west to east through P&M Estates. Arndt described the creek, under normal conditions, as about six feet wide and several inches deep. Chapel Street ran across the creek by means of a double-culvert, installed in 1991, with each culvert being about five feet in diameter and thirty feet in length.

{¶14} Arndt testified that he was never advised by anyone at P&M Estates that the creek was subject to periodic flooding. Arndt testified that, while he lived at P&M Estates, he documented four major flood events that caused property damage, although there were other floods which he did not document. Arndt claimed an estimated $11,500 in damages for flood events occurring December 1999, April 2001, May 2002, and July 2003. Arndt admitted that he did not keep receipts, but estimated his damages based on the fair market value of the items destroyed.

{¶15} Arndt produced photographs of the various flood events, but could not, with certainty, identify some of the photographs with a particular flood event.

---

1. The creek is alternatively identified as Eagle Creek.

4

{¶16} Arndt testified that he believed the flooding was either caused or aggravated by the Chapel Street culverts, which blocked the flow of debris.

{¶17} During flood events, Arndt would have to wade through standing water to reach his vehicle. The skirting around his home was often damaged or destroyed and had to be replaced. Equipment kept in a shed on his lot was destroyed. The most severe flooding occurred in July 2003, when the flooring of his home, including insulation and ductwork, became saturated. As a result, Arndt ultimately abandoned his home. After a flood event, Arndt testified that he had to clean up debris, sediment, and sewage left in his yard.

{¶18} After the July 2003 flood, Arndt denied that he received any insurance money, although there was evidence of a payment from American Family Insurance for $3,945.

{¶19} Arndt testified that his brother lived in P&M Estates since 1996, on a lot located on South Dunston Street, two lots away from the creek and upstream from the culvert bridge. Although Arndt helped his brother move in 1996 and registered a vehicle at P&M Estates in 1997, he claimed to be unaware of the creek's tendency to flood.

{¶20} Plaintiff, Dianne Lough, is the wife of plaintiff, Dusty Lough, and mother of plaintiff, Dusty Wolfe. Lough testified that she lived on the property as a child, when it was known as Smith's dairy farm. Beginning in 1974, Lough lived on North Dunston Street, one lot away from the creek.

{¶21} Lough testified that there were no problems with flooding until the culverts were installed, although she could not specifically recall any particular flood events or property damage occurring in the 1990s.

**{¶22}** Lough claimed damages of approximately $25,850, primarily from the loss of a vehicle and her home following the July 2003 flood.

**{¶23}** Lough testified that her daughter moved out of P&M Estates in 1993, and returned in 1999. Although Lough helped to finance the purchase of her daughter's home, she did not advise her of the creek's tendency to flood.

**{¶24}** Plaintiff, Dusty Wolfe, Lough's daughter, testified that, when she moved back into P&M Estates in 1999, she intentionally chose a lot next to the creek. After returning to P&M Estates, Wolfe recalled the creek flooding "a few times," but could not recall any damage prior to the July 2003 flood.

**{¶25}** Wolfe claimed damages in the amount of $17,500, representing her estimation of her home's market value.

**{¶26}** Wolfe admitted that she might not have been living in P&M Estates at the time of the July 2003 flood. Wolfe admitted that she was unaware that a fraud claim had been filed on her behalf against P&M Estates. Wolfe also admitted that she did not identify her claims against P&M Estates in a bankruptcy petition filed in December 2002.

**{¶27}** Plaintiff, Robert Wilcox, is the husband of plaintiff Denise Wilcox. Wilcox testified that he moved into P&M Estates in 1987. Wilcox testified that he purchased a home for $2,000 from his wife's parents on North Chapel Street, two lots away from the creek. The title for the home indicates that it was a gift to his wife, although Wilcox maintained that he paid for the home.

**{¶28}** Wilcox testified that until the culverts were installed, there were no major floods at P&M Estates. Thereafter, there were six to eight major floods in the 1990s and a couple each year from 2000 to 2002. Wilcox documented various flood events with pictures and video. The photographs and video demonstrate that the water level

6

was higher upstream of the culvert bridge than it was downstream. Wilcox conceded the dates of certain flood events were misidentified.

{¶29} Wilcox claimed damages of approximately $11,000, representing the loss of a vehicle, personal property, and the home. Wilcox' damages figures were primarily based on his own value estimations rather than receipts. All of Wilcox' claimed damages were the result of the July 2003 flood. Wilcox testified that, during this flood, the waters did not reach the flooring of his home, but, rather, debris under his home forced the water into the ductwork.

{¶30} Wilcox testified that a single culvert was originally installed in 1991 and that a second culvert was added in 1992. Wilcox testified that he placed the flags indicating the high-water mark of the July 2003 flood at the request of the plaintiffs' hydrologic/hydraulic expert, Philip De Groot.

{¶31} Plaintiff, Denise Bly, wife of plaintiff Doug Bly, testified that they have lived at P&M Estates since 1990, on South Essex Street, adjacent to the creek.

{¶32} Bly testified there was no major flooding until the installation of the culvert bridge. Thereafter, flooding was recurring. During the 1990s, the creek spilled its banks but caused little property damage. After 2001, Bly testified there were seventeen major floods.

{¶33} Bly claimed damages of approximately $10,000, representing damage to her home, landscaping, and personal property. Bly's damages were based on actual receipts as well as estimated losses. Bly's claimed damages were the results of flood events in spring 1999, December 1999, April 2001, May 2002, July 2002, July 2003, January 2005, December 2005, September 2006, October 2006, December 2006, and

7

January 2007. Bly conceded that several of the flooding dates were approximations, after it was shown that no precipitation occurred on those dates.

**{¶34}** Bly acknowledged that flooding continued after the removal of the culvert bridge in 2007.

**{¶35}** Plaintiff, Darlene Stanley, testified that she began living in P&M Estates in 1971, and since 1984 has lived on South Dunston Street, adjacent to the creek.

**{¶36}** Stanley testified that there were three major floods at the park during the time that the culvert bridge existed, although some flooding occurred almost annually.

**{¶37}** Stanley claimed damages of approximately $6,500, representing damage to her home, vehicles, personal property, and landscaping. Stanley's damages were based on actual receipts as well as estimated losses. Stanley's claimed damages were the result of flood events in April 2001, May 2002, and July 2003.

**{¶38}** Plaintiff, Paul Kellar, moved into P&M Estates in 1999 and lived in a lot adjacent to the creek on North Chapel Street until September 2004.

**{¶39}** Kellar testified to four major flood events occurring in November 1999, April 2001, July 2003, and January 2004. Kellar's damages for the loss of personal property and home repairs as a result of these floods were an estimated $5,000, including moving expenses.

**{¶40}** Kellar conceded that the dates on which he claimed floods occurred were not entirely accurate.

**{¶41}** Kellar testified that he filed for bankruptcy in October 2001 but did not identify his claims against P&M Estates in his petition. Kellar claimed that he did not understand the bankruptcy proceedings on account of his deafness.

**{¶42}** Plaintiff, Jason DeBolt, husband of plaintiff Darlene DeBolt, testified that he purchased a home at P&M Estates in mid-2001, while he was working and living in Brooklyn, New York. At the time, DeBolt was dating Darlene but did not realize that she had grown up in P&M Estates and that his home on North Dunston Street was across from Darlene's parents' home. DeBolt moved into his home, which was adjacent to the creek, in October 2001. In December 2004, DeBolt was evicted from P&M Estates.

**{¶43}** DeBolt described the creek as normally being two to four inches deep and four to five feet wide. DeBolt admitted that the creek could flood downstream, as well as upstream, from the culvert bridge on Chapel Street.

**{¶44}** DeBolt identified five major floods during his residency at P&M Estates, two of which occurred in May 2002, one in June 2002, one in July 2003, and one in February 2004.

**{¶45}** DeBolt claimed damages of approximately $55,000 as a result of the floods in May 2002 and July 2003, although DeBolt admitted that it was sometimes impossible to assign a particular loss to a particular flood. DeBolt's damages were based on receipts and estimated damages. DeBolt acknowledged that some dates on some receipts were altered.

**{¶46}** DeBolt took numerous photographs of flood events. He admitted that some photographs were attributed to him which he did not take. He also admitted that some photographs, allegedly of flooding that occurred in 2002, were actually developed in 2001.

**{¶47}** DeBolt acknowledged making an insurance claim in 2002, but maintained that the claim was for water damage and not flooding.

9

**{¶48}** DeBolt testified that his fraudulent misrepresentation claim against P&M Estates was based on its failure to advise him of the creek's tendency to flood.

**{¶49}** DeBolt admitted that he was fired from his job as a coatings inspector for KTA-Tator for taking bribes from a contractor. DeBolt was subsequently involved in a federal investigation which he did not disclose to the defendants in discovery.

**{¶50}** Plaintiff, James Manges, lived with and married plaintiff, Patricia Manges, during his residency at P&M Estates from 1997 to 2004. Manges' home was on North Chapel Street, one lot away from the creek.

**{¶51}** Manges claimed to have experienced many major floods, but was uncertain about the dates.

**{¶52}** Manges estimated approximately $13,000 in damages, primarily the loss of his home. Manges associated all damages with the May 2002 flood.

**{¶53}** Manges testified that he was never told about the creek's tendency to flood, but was uncertain if he was making a claim for fraud.

**{¶54}** Carol Hoskins testified that she had been a resident of P&M Estates since 1989. Between 2001 and 2004, she was the resident manager with responsibility for reporting complaints to the park operators, monitoring Eagle Creek, and closing Chapel Street during flood events. Carol testified that, prior to 2002, she received no complaints about flooding. After 2002, she received complaints from Arndt, Wilcox, DeBolt, and Kellar, specifically about the culvert bridge.

**{¶55}** Carol Wise (kna Foster) testified that she is the general manager of Modern Management Solutions, which operates P&M Estates on behalf of KMV V. Foster testified that, at all times relevant to the plaintiffs' claims, P&M Estates was licensed to operate as a manufactured home park by the Portage County Health

Department.  P&M Estates does not sell or lease homes.  Residents must complete an application and obtain park approval before they may rent a lot at P&M Estates.

**{¶56}** Foster testified that she did not advise the plaintiffs of the creek's tendency to flood at the time she approved their applications, and that she was not aware that their lots were subject to flooding.  Foster acknowledged that the park sustained major floods in April 2001, May 2002, and July 2003.  Foster denied that there was a significant flood in 1999 and described the April 2001 flood as causing minor damage, mainly to the skirting around certain homes.

**{¶57}** Foster testified that, in September 2001, she learned that portions of P&M Estates lay within a 100-year flood plain.  In January 2002, P&M Estates submitted a state-mandated flood study prepared by Tinari Engineering.  Also in accordance with state regulations, P&M Estates must report every time the creek overflows its banks.  Following the May 2002 flood, Foster contacted Barry Rice of the state health department to help assess the flooding situation.  At this time, she also contacted the Army Corps of Engineers to help assist with the flooding situation.

**{¶58}** Foster testified that the park receives a considerable amount of debris from the Horner property located to the west of P&M Estates whence the creek flows into the park.  Foster also testified that, at the east end of P&M Estates, there is a reduced flow of water onto the Bigler property.  P&M Estates has tried to work with Horner and Bigler to decrease the amount of debris coming into the park, and increase the flow of water out of the park, but the neighboring property owners have been uncooperative.  Foster testified that P&M Estates has the creek dredged regularly to remove silt and debris.

11

{¶59} Foster testified that she did not believe that the culvert bridge either caused or aggravated the flooding problem at P&M Estates. She noted that flood events affected residents both upstream and downstream from the culvert. In 2007, the culvert bridge was removed and replaced with a "span bridge" (a beam bridge). However, the creek continues to overflow its banks.

{¶60} Foster acknowledged that it would be possible to raise homes along the creek higher (although this would not avoid damage to the skirting) and move homes to lots away from the creek. Foster did not recall the plaintiffs making complaints about the culvert bridge or asking to have their homes moved. Foster testified that there has been virtually no communication with the plaintiffs since the first suit was filed against P&M Estates in 2002.

{¶61} Ray Vehovec testified that he purchased P&M Estates (then Portage County Mobile Home Estates) out of bankruptcy in 1987. Since then, the park has successively been owned by P&M Ltd. and KMV V.

{¶62} Vehovec testified that, when he purchased the park, the only access to the lots north of the creek was by a beam bridge on Bradfield Street. Vehovec installed the culvert bridge to increase access to that part of the park to the north of the creek. Vehovec denied that the Chapel Street bridge ever consisted of a single culvert. Vehovec also testified that Bigler's property was dredged about the time he purchased the park, and this significantly lowered the level of the creek.

{¶63} Vehovec acknowledged that damaging flood events occurred in April 2001, May 2002, and July 2003. Vehovec denied receiving complaints about flooding prior to this time. Vehovec acknowledged that in 1993 a resident complained about debris in his yard and that the park moved his home.

12

**{¶64}** David Bigler testified that he owns the property to the east of P&M Estates. Bigler testified that the creek has always flooded when there was heavy rain. In response to a letter from Vehovec requesting him to remove trees along the stream bed on his property, Bigler advised Vehovec that he should relocate the homes along the creek on his property.

**{¶65}** Plaintiff, Denise Wilcox, testified that she lived with her parents at P&M Estates until 1981 when she moved out, and that she returned in 1987 when she purchased her parents' home. In her prior deposition testimony, Wilcox testified that she lived with her parents at P&M Estates from 1980 to 1987.

**{¶66}** Denise Wilcox testified to numerous major floods, and expressed her concern that the floods carried bacteria. Wilcox acknowledged that P&M Estates would clean up debris after a flood.

**{¶67}** William K. Mzik testified that he has lived in P&M Estates since 1992. Mzik lives on North Chapel, adjacent to the Wilcox' but closer to the creek. Mzik testified that, in the July 2003 flood, he only suffered damage to his skirting. Mzik experienced multiple floods that often left a sewage type smell. Mzik testified that the creek continues to flood after the removal of the culvert bridge, but "not as bad."

**{¶68}** Philip De Groot, a professor of civil and environmental engineering at Cleveland State University, testified on behalf of the plaintiffs as a hydrologic and hydraulic expert.

**{¶69}** In 2005, De Groot conducted an analysis of the July 2003 flood event. De Groot based his analysis on the high-water mark of the July 2003 flood. De Groot used park residents to indicate the extent of the July 2003 flood. On the day that De Groot conducted his survey of the flood, there were ten to twelve inches of snow on the

13

ground. De Groot's analysis of the July 2003 flood was not able to take into account water velocity or the amount of sediment in the creek. De Groot acknowledged that the July 2003 flood was a greater than one hundred-year flood event.[2]

{¶70} De Groot concluded that the two culverts used to form the bridge on Chapel Street were improperly sized and aggravated the severity of the flood events. With respect to the July 2003 flood, De Groot testified that the culvert bridge increased the depth of the flood by three-tenths of a foot and the width of the flood by twenty-four feet (twelve feet on each side of the creek). Based on the data of the July 2003 flood, De Groot opined that the culvert bridge would have had an even greater impact on smaller flood events, for example, increasing the width of a two-year flood event from 110 feet to 287 feet.

{¶71} De Groot acknowledged that the creek would flood even if both bridges were removed ("if it's a creek, it will flood"). De Groot noted that the creek bed was steeper at the western end of the property and that flow velocity decreased as the creek reached the eastern end of the property. De Groot acknowledged that it would not be remarkable if lots nearer to Bigler's property flooded first, although he believed that Bigler's property had only a minimal effect on the extent of the flooding.

{¶72} At the close of De Groot's testimony, the plaintiffs rested their case. Upon defense motion, the trial court granted directed verdicts with respect to plaintiffs, Patricia Manges and Dusty Lough, based on judicial estoppel and/or failure to prosecute. The court granted directed verdicts with respect to plaintiffs, Dusty Wolfe and Paul Kellar, based on judicial estoppel. The court granted a directed verdict with respect to plaintiff

---

2. I.e., a flood such as the July 2003 flood would not be expected to occur again for over a hundred years.

14

Darlene DeBolt, based on the merits of her claims and failure to prosecute. The court granted directed verdicts with respect to plaintiffs Doug Bly and David Lough, based on failure to prosecute. The court dismissed all claims against defendant, Ray Vehovec, based on the statute of limitations. Finally, the court granted directed verdicts with respect to plaintiffs' statutory claims that the defendants failed to "do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition"; to "[k]eep all common areas of the premises in a safe and sanitary condition"; and to "[m]aintain in good and safe working order and condition * * * sanitary and storm sewers." R.C. 4781.38(A)(2), (3) and (4).

{¶73} The defendants presented testimony from the following witnesses in their defense:

{¶74} Daniel Alvin Luli testified that he is an employee of H. Luli Construction. Luli testified that Luli Construction has been dredging and clearing debris from the creek for P&M Estates since 1987. Luli described dredging as removing silt and sunken debris from the stream bed. Luli Construction has also removed debris from the park following flood events.

{¶75} Luli testified that the depth of the creek has increased since 1987. Luli testified that sometimes dredging will decrease the water level of the creek, but that this does not always occur. Luli testified that the creek has continued to flood after the removal of the culverts.

{¶76} Vicki Gilpin testified that she is employed as an office manager by Modern Management Solutions. Gilpin testified that she regularly issues notices of flood events to the Portage County Health Department as required by state law. Gilpin testified that Luli Construction is diligent about monitoring debris in the creek.

15

**{¶77}** Sherrie Jones testified that she owns S&S Financial Services and that she has provided financing for residents of P&M Estates, including Jason DeBolt. Contrary to DeBolt's prior testimony, Jones testified that Darlene DeBolt contacted her in 2001 about a loan on Jason's behalf and was very excited that they were buying a home next to her mother. Jones also testified that she sold the DeBolts an insurance policy with flood coverage (which was normally included in policies for residents of P&M Estates). The policy was cancelled for nonpayment in February 2003.

**{¶78}** Dennis Francis Andres testified that he is an agent with American Modern Insurance Group. Andres testified that DeBolt was paid $9,672.36 for a flood claim in 2002 and that Arndt was paid $2,923.15 for a flood claim in 2003, contrary to the prior testimony of DeBolt and Arndt.

**{¶79}** Lawrence Tourville testified that he has been a resident of P&M Estates since 1996 with a home on North Dunston Street. Tourville testified that he signed a petition circulated by the plaintiffs asserting that signors "have suffered repeated and numerous damages due to flooding caused by the inadequate culvert system in bridge over creek." Tourville admitted that he actually suffered no damages due to flooding, but thought that the culverts were too small. Tourville testified that the creek could overflow without causing damages and that it has flooded since the removal of the culverts.

**{¶80}** James Molnar testified that he has been a resident of P&M Estates since 2000 with a home on North Ashington. Molnar testified that water only reached his lot during the July 2003 flood and that water appears to back up from the east end of the park property.

16

{¶81} Prior to the return of the jury's verdict, the trial court modified its earlier ruling on defendants' motions for directed verdicts by reinstating plaintiff, Dusty Wolfe's, claims for property damage incurred after December 26, 2002 (the date of her bankruptcy filing).

{¶82} On January 17, 2013, the jury returned a verdict in favor of the defendants on all claims.

{¶83} With the verdict, the jury returned the following interrogatories:

Interrogatory No. 1.A. Do you find that defendants were negligent in violation of a statutory duty by failing to use ordinary care to prevent recurrent damaging flooding to any plaintiff? No.

Interrogatory No. 1.B. Do you find that each plaintiff sustained property damages proximately caused by recurrent flooding which could have been prevented by defendants' use of ordinary care? No.

Interrogatory No. 2. Do you find that at the time each of the following plaintiffs [Arndt, Manges, and DeBolt] first leased a lot from defendants, defendants were on notice of the risk of damaging recurring flooding? No.

Interrogatory No. 3. Do you find that at the time each plaintiff [Arndt, Manges, and DeBolt] first leased a lot from defendants, defendants had superior (greater) knowledge of the risk of damaging recurring flooding? No.

17

{¶84} On January 18, 2013, the trial court issued a Judgment Entry, memorializing the jury's verdict and the court's ruling on the defendants' motions for directed verdict.

{¶85} On January 24, 2013, the plaintiffs filed a Motion for Judgment Notwithstanding the Verdict or for New Trial.

{¶86} On January 29, 2013, the plaintiffs filed a Request for Extension of Time to Investigate Possible Juror Misconduct under Civ.R. 59(A)(2).

{¶87} On January 31, 2013, the trial court issued a Judgment Entry, denying plaintiffs' "request for additional time to amend their Motion for a new trial and/or to file any Affidavits in support thereof."

{¶88} On February 1, 2013, the plaintiffs filed a Motion for Mistrial under Civ.R. 59(A)(2) and Request for Hearing, based on alleged "newly discovered juror misconduct."

{¶89} On February 19, 2013, the defendants filed a Motion for Sanctions for Frivolous Conduct and Multiple Violations of Civil Rule 11.

{¶90} On March 4, 2013, the trial court issued an Order, denying the plaintiffs' Motions for Judgment Notwithstanding the Verdict, New Trial, and Mistrial, and denying the defendants' Motion for Sanctions.

{¶91} On April 3, 2013, the plaintiffs filed their Notice of Appeal.

{¶92} On April 10, 2013, the defendants filed their Notice of Cross-Appeal.

{¶93} On appeal, the plaintiffs raise the following assignments of error:

{¶94} "[1.] The trial court committed prejudicial error by: (1) blocking Plaintiffs' attempt to ensure prospective jurors did not confuse the familiar standard of common law negligence with a park operator's special statutory obligations; and (2) accepting

18

Defendants' last-minute jury interrogatories that inject the lower standard of 'ordinary care' in order to shield themselves from statutory liability."

**{¶95}** "[2.] The trial court committed prejudicial error when it denied Plaintiffs' motion for summary judgment on Defendants' admitted violation of their statutory obligation to prevent recurrent flooding."

**{¶96}** "[3.] The trial court committed prejudicial error in granting Defendants' motions for directed verdict due to lack of evidence, failure to reopen bankruptcy, failure to prosecute, and expiration of the statute of limitations."

**{¶97}** "[4.] The trial court committed prejudicial error by blocking Plaintiffs' attempt to rebut contradictory testimony from a key surprise witness on critical aspects of their case-in-chief."

**{¶98}** "[5.] The trial court committed prejudicial error in denying Plaintiffs' motion for judgment notwithstanding the verdict or new trial when the evidence overwhelmingly established Defendants' breach of statutory obligation and fraudulent concealment."

**{¶99}** "[6.] The trial court committed prejudicial error when it denied Plaintiffs' motion for a separate trial of Jason and Darlene DeBolts' claims in order to prevent Defendants from using their unique issues to prejudice jurors against the remaining plaintiffs."

**{¶100}** "[7.] The trial court committed prejudicial error in denying Plaintiffs' motions for mistrial and/or evidentiary hearing to evaluate juror misconduct reported personally by an alternate juror to the assistant jury commissioner."

**{¶101}** In response to the plaintiffs' assignments of error, the defendants raise the following cross-assignment of error, pursuant to Local Rule 16(C)(4):

**{¶102}** "The judgment in favor of P&M Estates should be affirmed because: 1) plaintiffs' conduct undermined the fact-finding function of trial beyond repair; and 2) plaintiffs' claims are barred by *res judicata*."

**{¶103}** On cross-appeal, the defendants raise the following assignment of error:

**{¶104}** "The trial court erred in denying P&M Estates' motions for sanctions for frivolous conduct under R.C. 2323.51 and Civ.R. 11 or, at minimum, erred in failing to hold an evidentiary hearing on the issues raised in P&M Estates' motions."

**{¶105}** In their first assignment of error, the plaintiffs raise two arguments. The first is that the trial court improperly limited their voir dire of prospective jurors. The plaintiffs' argument is based on the following exchange which occurred during the voir dire of the jury:

> Mr. Cochran: Let's go to some of the road blocks that we anticipate. First, the nature of the case is based on a special statute that recognizes [a] unique relationship between a park operator and its residents in a mobile home park.
>
> The Court: The objection shall be sustained. Counselor, again, the issue of what the law is will be taken care of by the Court at an appropriate time.
>
> Mr. Cochran: Thank you, Your Honor. I'm trying to make sure they understand the difference between a case that involves simple negligence like a car accident versus a statutory obligation.
>
> * * *

Mr. Cochran: One of the reasons -- The statute has several special definitions. I want to make sure that they understand to apply those definitions.

The Court: That's not what their job is. Their job is to determine facts in the case. The Court will instruct them on the law, and all you have to do is get them to promise that they will follow the law as given to them by the Court. That's my understanding.

{¶106} "The purpose of the examination of a prospective juror upon his *voir dire* is to determine whether he has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant." *Vega v. Evans*, 128 Ohio St. 535, 191 N.E. 757 (1934), paragraph one of the syllabus. "The character and scope of such questions * * * must be controlled by the court in the exercise of its sound discretion." *Krupp v. Poor*, 24 Ohio St.2d 123, 265 N.E.2d 268 (1970), paragraph one of the syllabus. "Judicial discretion is the option which a judge may exercise between the doing and not doing of a thing which cannot be demanded as an absolute legal right, guided by the spirit, principles and analogies of the law, and founded upon the reason and conscience of the judge, to a just result in the light of the particular circumstances of the case." *Id.* at paragraph two of the syllabus.

{¶107} Here, the trial court properly exercised its discretion to prevent the plaintiffs' attorney from discussing the substantive law with prospective jurors. A juror's understanding of the difference between "simple negligence" and a "statutory obligation" is not relevant to the issues of whether that juror is biased against the litigants or is unwilling to follow the law as given by the court. Moreover, it is the responsibility of the court, not the attorneys, to instruct the jurors on what the law is. *Martin Co. v. Roulette*

*Pontiac-Cadillac-GMC, Inc.*, 11th Dist. Lake No. 13054, 1988 Ohio App. LEXIS 4863, 4-5 (Dec. 9, 1988) ("[i]t is for the court to instruct the jury what the law is, and what statutes and ordinances, if any, are in force and effect, and to submit to and instruct the jury only as to the statutes and ordinances which apply to the issues involved, leaving it for the jury generally, to say whether there has been a violation of such laws") (citation omitted).

{¶108} The plaintiffs' second argument under the first assignment of error is that the trial court erred by accepting the defendants' jury interrogatories, which were both untimely and misstated the law. We reject both contentions.

{¶109} According to Ohio Civil Rule 49(B):

> The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶110} "The requirement of Civ.R. 49(B) that a court 'shall submit written interrogatories to the jury * * * upon the request of any party prior to the commencement of argument' is mandatory, but the further requirement of the rule that 'the interrogatories shall be submitted to the jury in the form that the court approves' reposes

discretion in the trial court to review and approve the appropriateness and content of proposed interrogatories." *Ragone v. Vitali & Beltrami, Jr., Inc.*, 42 Ohio St.2d 161, 327 N.E.2d 645 (1975), paragraph one of the syllabus.

{¶111} In the present case, the plaintiffs filed Proposed Jury Interrogatories on December 21, 2012, over two weeks before the start of trial. The Proposed Interrogatories contained the following: "Do you find that defendants were negligent by failing to use ordinary care to prevent recurrent damaging by flooding?" and "Do you find that [the plaintiffs] sustained property damages due to recurrent flooding which defendants did not use ordinary care to prevent?"

{¶112} On January 16, 2013, after both parties had rested their cases and before closing arguments were given, the defendants presented the trial court with revised interrogatories. The court noted that the defendants' original Proposed Interrogatories were "voluminous" and, in the court's opinion, inappropriate to submit to the jury in that form. The court continued that it did "believe that there have been at least several interrogatories that * * * are readily understandable," and, in the exercise of its discretion, would "give those to the jury at the appropriate time." At this point, counsel for the plaintiffs duly objected to the giving of these interrogatories.

{¶113} As the trial court advised the parties of its proposed action with respect to interrogatories before closing arguments and plaintiffs were afforded the opportunity to object, we find no error with the timeliness of the interrogatories given.

{¶114} Plaintiffs also take exception to the substance of the interrogatories, in particular, the following:

Interrogatory No. 1.A. Do you find that defendants were negligent in violation of a statutory duty by failing to use ordinary care to prevent recurrent damaging flooding to any plaintiff? No.

Interrogatory No. 1.B. Do you find that each plaintiff sustained property damages proximately caused by recurrent flooding which could have been prevented by defendants' use of ordinary care? No.

{¶115} Plaintiffs maintain that the reference to "ordinary care" in the interrogatories was erroneous, and that the appropriate question for the jury was whether the defendants failed to prevent recurrent flooding, i.e., whether they were guilty of negligence per se.

{¶116} As an initial matter, the trial court's interrogatories were consistent with the court's instruction of the jury: "Now, if compliance with a statutory obligation is impossible, despite the exercise of reasonable diligence and care, the person cannot be held to have violated that statutory duty. On the other hand, if an actor does not exercise reasonable diligence and care to comply with the statute, then that person may be found to have breached that statutory obligation."

{¶117} Moreover, the trial court's interrogatories were consistent with this court's pronouncement of the law in *Arndt v. P&M Ltd.*, 11th Dist. Portage No. 2007-P-0038 and 2007-P-0039, 2008-Ohio-2316:

A park operator's duty under R.C. 3733.10(A)(1)/Adm.Code 3701-27-07, as the trial court recognized, is to do what is reasonably necessary to prevent recurrent flooding. * * * [T]he Ohio Supreme Court construes such statutes as requiring the actor to use

24

'reasonable diligence and care' to comply with the statutory obligation and that, if compliance is impossible despite such diligence and care, the actor is relieved of liability. *Robinson* [*v. Bates*, 112 Ohio St. 3d 17], 2006-Ohio-6362, [857 N.E.2d 1195,] ¶23 (citation omitted). Conversely, where an actor fails to exercise reasonable diligence and care to comply with the statutory duty, they may be found liable.

*Id.* at ¶ 55.

{¶118} As the interrogatories given by the trial court are consistent with the law as pronounced by this court, we find no error in them. *Compare Nolan v. Nolan*, 11 Ohio St.3d 1, 462 N.E.2d 410 (1984), syllabus ("[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case").

{¶119} The first assignment of error is without merit.

{¶120} In their second assignment of error, the plaintiffs contend the trial court erred by denying their Motion for Partial Summary Judgment on the issue of whether the defendants breached their statutory duty to prevent recurrent flooding as a matter of law. Plaintiffs claim they were entitled to judgment as a matter of law on this issue on account of defendants' admissions that the park is subject to recurrent flooding.

{¶121} Contrary to the plaintiffs' claim that no genuine issue of material fact existed as to whether the defendants breached their statutory duty, the jury concluded that the defendants did not breach their statutory duty, as evidenced by Jury Interrogatories 1.A and 1.B.

{¶122} The Ohio Supreme Court has held: "Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 642 N.E.2d 615 (1994), syllabus.

{¶123} Since the trial on the merits of plaintiffs' claims demonstrated that there was a genuine issue of material fact supporting a judgment in favor of the defendants, plaintiffs' argument under the second assignment of error is rendered moot. *Huntington Natl. Bank v. Val Homes, Inc.*, 11th Dist. Geauga No. 2011-G-3021, 2012-Ohio-526, ¶ 34.

{¶124} The second assignment of error is without merit.

{¶125} In the third assignment of error, plaintiffs claim the trial court erred by granting defendants' motions for directed verdict following the close of their case.

{¶126} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." Civ.R. 50(A)(4).

{¶127} "A motion for a directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982), paragraph one of the syllabus.

26

Accordingly, we review the granting of a motion for directed verdict under a de novo standard. *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, ¶ 22; *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 23.

{¶128} The plaintiffs maintain that the trial court erred by dismissing their claims based on the defendants' violation of its statutory duties to "do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition" and "[k]eep all common areas of the premises in a safe and sanitary condition." R.C. 4781.38(A)(2) and (3). Plaintiffs rely on testimony that the flood water carried toilet paper and sewage, the flood's current was perilous, gas meters and electrical boxes were often submerged, roads were inundated, and plaintiffs, Arndt and DeBolt, ultimately abandoned their homes.

{¶129} The testimony cited by the plaintiffs generally described the condition of the park during flood events, not the condition of the park in its usual state. There was no testimony that, following a flood event, park operators failed to restore or repair those areas of the park for which they were responsible. Under Ohio law [R.C. 4781.39] and the plaintiffs' rental agreements with P&M Estates, residents were responsible for maintaining their own lots, including the removal of debris following a flood event and repairing damaged skirting. Nor was there testimony that, following a flood event, the park was rendered uninhabitable or unfit for human habitation. In the absence of such evidence, the defendants were entitled to a directed verdict with respect to the condition of the premises. *Sterling v. Stevens*, 7th Dist. Jefferson No. 02 JE 47, 2003-Ohio-5153, ¶ 9; *Taylor v. Alexander*, 11th Dist. Trumbull No. 3550, 1986 Ohio App. LEXIS 7530, 7-8 (July 11, 1986).

{¶130} With respect to common areas, there was only fleeting testimony that such areas would have debris or mud deposited in them following a flood. Such evidence does not create a trial issue of fact as to whether the defendants failed to keep common areas safe and sanitary.

{¶131} The plaintiffs maintain that the trial court erred by directing verdicts against Patricia Manges, Dusty Lough, Dusty Wolfe, and Paul Kellar on the grounds of judicial estoppel; against Doug Bly for failure to prosecute; and in favor of Ray Vehovec on the grounds that plaintiffs' claims were time-barred.

{¶132} Consideration of these arguments is rendered moot, however, by virtue of the jury's verdict absolving the defendants on any liability for the flooding. In other words, the active presence of these parties in the case at the time it was submitted to the jury would not have altered the outcome. *Kuhn v. Kleptz*, 2nd Dist. Montgomery No. 20668, 2005-Ohio-4528, ¶ 52 ("[e]ven if we assume that the trial court erred in directing a verdict on the proper measure of damages, any error would have been harmless, since the jury did not find in favor of the Kuhns on their liability claims"); *Brandon/Wiant Co. v. Cadle Co.*, 8th Dist. Cuyahoga No. 74752, 1999 Ohio App. LEXIS 5672, 13-14 (Dec. 2, 1999) ("the standard for deciding a motion for summary judgment and a motion for directed verdict is essentially the same"); *Burns v. Krishnan*, 9th Dist. Lorain No. 96CA006650, 1998 Ohio App. LEXIS 258, 18 (Jan. 28, 1998) ("[e]ven if it might have been questionable as to whether or not a directed verdict was warranted * * *, the jury's verdict in favor of Dr. Branch rendered the matter moot").

{¶133} The third assignment of error is without merit.

28

{¶134} In their fourth assignment of error, the plaintiffs contend that the trial court erred by not allowing them to present the testimony of Todd Griswold, as a rebuttal witness, following the close of the defendants' case.

{¶135} "Rebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." *State v. McNeill*, 83 Ohio St.3d 438, 446, 700 N.E.2d 596 (1998). "It is within the trial court's discretion to determine what evidence is admissible as proper rebuttal." *Id.*; *Morris v. Faurot*, 21 Ohio St. 155, 162 (1871). However, "[a] party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994).

{¶136} Plaintiffs assert that Griswold's testimony was necessary to rebut the testimony of the defendants' witness Lawrence Tourville. Tourville's purportedly "surprise" testimony consisted of his denial that the park had suffered flooding during the 1990s, he did not observe his neighbors suffer damage as a result of flooding, and he signed the petition to remove the culvert bridge despite not having "repeated and numerous damages" as claimed in the petition.

{¶137} Tourville's testimony did not introduce any new facts into evidence so as to create an unconditional right to introduce rebuttal testimony. As to flooding during the 1990s, several of the witnesses called by the plaintiffs denied that it occurred, such as Carol Hoskins and Carol Wise. Several of the plaintiffs themselves, such as Dianne Lough, Paul Kellar, and James Manges, had difficulty recalling flood events during the 1990s, were uncertain whether they occurred, and, if they did, whether they caused any

29

damage. Similarly, several of the plaintiffs, including Chris Arndt, Robert Wilcox, and Jason DeBolt, testified about their efforts to gain signatures, such as Tourville's, for the petition which was marked as an exhibit during the plaintiffs' case-in-chief. It should also be noted that Tourville was identified as a potential witness prior to trial.

{¶138} We find no abuse of discretion in the trial court's decision to exclude the plaintiffs' rebuttal witness where, as here, the evidence to be rebutted was introduced by the parties who seek to rebut it. *Weimer v. Anzevino*, 122 Ohio App.3d 720, 726, 702 N.E.2d 940 (7th Dist.1997) ("Appellant may rebut evidence adverse to her side, but that evidence must be introduced by the opposing party and not by Appellant herself").

{¶139} The fourth assignment of error is without merit.

{¶140} In their fifth assignment of error, the plaintiffs contend that the trial court erred by denying their Motion for Judgment Notwithstanding the Verdict or for New Trial.

{¶141} "[N]ot later than twenty-eight days after entry of judgment [following a jury trial], a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion; or if a verdict was not returned such party, within twenty-eight days after the jury has been discharged, may move for judgment in accordance with the party's motion." Civ.R. 50(B); *Freeman v. Wilkinson*, 65 Ohio St.3d 307, 309, 603 N.E.2d 993 (1992) (Civ.R. 50(B) "only applies in cases tried by jury").

{¶142} "A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative." Civ.R. 50(B). "A new trial may be granted to all or any of the parties and on all or part of the issues," where "[t]he judgment is not sustained by the weight of the evidence." Civ.R 59(A)(6).

30

{¶143} When considering a motion for judgment notwithstanding the verdict, "[t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). "In considering a motion for judgment notwithstanding the verdict, a court does not weigh the evidence or test the credibility of the witnesses." *Osler v. Lorain*, 28 Ohio St.3d 345, 504 N.E.2d 19 (1986), syllabus; *Posin* at 275 ("[n]either the weight of the evidence nor the credibility of the witnesses is for the court's determination"). Thus, the question is whether there is sufficient evidence regarding a particular issue for the trial court to submit the issue to the jury for determination. *O'Day v. Webb*, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972), paragraph four of the syllabus. As a question of law, the standard of appellate review is de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

{¶144} "In evaluating the propriety of the trial court's decision premised on the weight of the evidence," however, "a reviewing court can reverse such an order for a new trial only upon a finding of an abuse of discretion." *Malone v. Courtyard by Marriott Ltd. Partnership*, 74 Ohio St.3d 440, 448, 659 N.E.2d 1242 (1996). When reviewing such a judgment, the court is "guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

31

{¶145} There is a basic difference between the duty of a trial court to submit a case to the jury where 'reasonable minds' could differ and the right of a trial court to grant a new trial on the basis of its conclusion that the verdict is not 'sustained by sufficient evidence.' The former does not involve any *weighing* of evidence by the court; nor is the court concerned therein with the question of credibility of witnesses. However, in ruling on a motion for new trial upon the basis of a claim that the judgment 'is not sustained by sufficient evidence,' the court must weigh the evidence and pass upon the credibility of the witnesses, not in the substantially unlimited sense that such weight and credibility are passed on originally by the jury but in the more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the manifest weight of the evidence.

(Emphasis sic.) *Rohde v. Farmer*, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraph three of the syllabus.

{¶146} The Ohio Supreme Court has recognized that the standard set forth in *C.E. Morris* "tends to merge the concepts of weight and sufficiency," so that "a judgment supported by 'some competent, credible evidence going to all the essential elements of the case' must be affirmed." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 26; *compare Poske v. Mergl*, 169 Ohio St. 70, 73, 157 N.E.2d 344 (1959) ("where there is a motion for a new trial upon the ground that the judgment is not sustained by sufficient evidence, a duty devolves upon the trial court to review the evidence adduced during the trial and to itself pass upon the credibility of the witnesses

32

and the evidence in general"). Accordingly, our standard of review with respect to the Motion for a New Trial is abuse of discretion. *Rohde* at paragraph one of the syllabus.

**{¶147}** The plaintiffs' first argument is that the defendants were liable, as a matter of law, for failing to ensure the park was not "subject to recurring flooding." Ohio Adm.Code 3701-27-07(A); R.C. 4781.38(A)(1) ("[a] park operator * * * shall * * * [c]omply with the requirements of all applicable building, housing, health, and safety codes which materially affect health and safety").

**{¶148}** Plaintiffs maintain that defendants' violation of the "recurring flooding" provision was conclusively established by the defendants' acknowledgement that the park suffered repeated flooding and the plaintiffs' testimony of damages. Defendants could only be excused for the violation, according to the plaintiffs, if they could demonstrate "*extraordinary* efforts to comply." The evidence of defendants' efforts to address the flooding, essentially writing letters to government agencies and/or neighboring landowners and periodic dredging, is legally insufficient to constitute the extraordinary efforts required to avoid liability. We disagree.

**{¶149}** The plaintiffs' reliance on an extraordinary efforts standard is misplaced. In Ohio law, the violation of public safety statutes may constitute strict liability, liability per se, or simply evidence of negligence. *Sikora v. Wenzel*, 88 Ohio St.3d 493, 495, 727 N.E.2d 1277 (2000). In the absence of evidence or argument that R.C. 4781.38(A)(1)/Ohio Adm.Code 3701-27-07(A) impose strict liability, the question is whether a violation is considered negligence per se or evidence of negligence. "When the statute sets forth a general, abstract description of a duty, a violation thereof can be considered evidence of negligence," but where "a statute sets forth a positive and definite standard of care, a violation of the statute constitutes negligence per se." *Mann*

33

*v. Northgate Investors, L.L.C.*, 138 Ohio St.3d 175, 2014-Ohio-455, 5 N.E.3d 594, ¶ 29. "Negligence per se is also different from strict liability, in that a negligence-per-se violation will not preclude defenses and excuses, unless the statute clearly contemplates such a result." *Robinson*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, at ¶ 23. "Most statutes are construed to require that the actor take reasonable diligence and care to comply, and if after such diligence and care the actor is unable to comply, the violation will ordinarily be excused." *Id.*, citing Restatement of the Law 2d, Torts, Section 288A, Comment g, at 38 (1965). Such was the interpretation of R.C. 4781.38(A)(1)/Ohio Adm.Code 3701-27-07(A) adopted by this court in a prior appeal of this matter. *Arndt*, 2008-Ohio-2316, at ¶ 55.

**{¶150}** As to whether the defendants exercised reasonable diligence and care to comply with R.C. 4781.38(A)(1)/Ohio Adm.Code 3701-27-07(A), there was sufficient evidence for that question to go to the jury.

**{¶151}** The plaintiffs also contend that they were entitled to judgment as a matter of law on their claims for fraudulent concealment. Plaintiffs' argument rests on the supposition that the evidence conclusively established that the park was subject to recurring flooding during the 1990s and that the defendants were aware of it. This supposition is not conclusively established by the evidence. As noted above, several witnesses, including some of the plaintiffs' own witnesses, were less than certain about the existence, nature, and extent of flooding during the 1990s. Such evidence must be construed in the defendants' favor. The plaintiffs point out that the defendants failed to advise Jason DeBolt about flooding, although he signed his lease after the acknowledged April 2001 flood event. In his case, DeBolt's credibility issues and the evidence support the jury's finding that he had superior knowledge, or the opportunity to

34

gain such knowledge, of the creek's tendency to flood. Accordingly, the plaintiffs' Motion for Judgment with respect to fraudulent misrepresentation was properly denied.

{¶152} Finally, plaintiffs claim they are entitled to a new trial on the grounds that the jury's verdict was a miscarriage of justice. Plaintiffs rely on their purportedly compelling evidence of property damage, the unopposed conclusions of their expert witness, and defendants' inadequate response to flood events. On the last point, plaintiffs again emphasize that the defendants could only avoid liability by exhausting "all reasonable efforts," rather than merely acting reasonably to prevent flooding. None of these points render the jury's verdict a manifest injustice or the trial court's refusal to grant a new trial an abuse of discretion. There was compelling testimony at trial both for and against plaintiffs' claims, as well as to support the verdict that, applying the appropriate legal standard, the defendants used reasonable diligence and care to comply with their statutory obligations.

{¶153} The fifth assignment of error is without merit.

{¶154} Under the sixth assignment of error, the plaintiffs argue the trial court erred by denying their Motion for Separate Trial of DeBolt Claims.

{¶155} "The court, after a hearing, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or third-party claims, or issues, always preserving inviolate the right to trial by jury." Civ.R. 42(B).

{¶156} A trial court's ruling on a motion for separate trials is reviewed for abuse of discretion. *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 317, 673 N.E.2d 1311 (1997).

{¶157} In denying the plaintiffs' motion, the trial court found that there were "common issues of fact concerning recurrent flooding which would be addressed in [a] separate trials," with "a danger of inconsistent results being returned." Moreover, the court did "not agree that separate trial will avoid the prejudice the DeBolts fear and seek to alleviate."

{¶158} Plaintiffs contend that the defendants adopted an intentional trial strategy of vilifying the DeBolts to prejudice the jury against all the plaintiffs. Plaintiffs note that the defendants' indictment of Jason DeBolt included allegations that he accepted a bribe, fabricated photographs, lied about the circumstances of his moving into P&M Estates, and lied about his knowledge of flooding. Plaintiffs further note that defendants suggested, in argument before the jury, that DeBolt orchestrated the entire litigation.

{¶159} We find no abuse of discretion. In the first place, the trial court properly instructed the jury: "[T]he rights of the Plaintiffs in this action are separate and distinct. The claims are being tried together for convenience. You should decide each Plaintiff's claims as if they were asserted in a separate action, and the instructions apply to each Plaintiff, unless otherwise indicated."

{¶160} Furthermore, the negative impact of Jason DeBolt's credibility issues would have been largely confined to his own claims. Apart from his testimony regarding his own damages, DeBolt offered little or no testimony on the issues of whether the creek flooded in the 1990s, the defendants' awareness of flooding prior to 2001, the

defendants' efforts to prevent or ameliorate the recurrence of flooding, and how the flooding affected other residents/plaintiffs.

{¶161} With respect to Jason DeBolt's falsely authenticating photographs of particular flood events, the defendants correctly note that most of the plaintiffs were implicated in similar conduct. Any prejudice resulting from the misidentification of photographs would not have been avoided by holding a separate trial for the DeBolts.

{¶162} For these, as well as the reasons stated in the trial court's Order, the sixth assignment of error is without merit.

{¶163} In their seventh assignment of error, the plaintiffs assert that the trial court erred by denying their Motion for Mistrial under Civ.R. 59(A)(2) and Request for Hearing, based on juror misconduct. The stated basis for the plaintiffs' motion was the following: "it appears that perceived discrepancies in the testimony of a minority of Plaintiffs [i.e., Jason DeBolt] were applied against the majority of Plaintiffs without any evidentiary basis or support." In support of the motion was an attached affidavit of plaintiffs' attorney, George W. Cochran, who testified as follows:

> 2. Soon after the defense verdict was rendered, I had occasion to speak with Marie Kunka, Deputy Jury Commissioner for the Portage County Common Pleas Court. Ms. Kunka informed me of a conversation she had with Carol D. Kellar, one of two alternate jurors, who had heard all the evidence before being discharged prior to deliberations.
>
> 3. During that conversation, Ms. Kellar shared her opinion that jurors had found for Defendants because the Plaintiffs had:
>
> > a. Tampered with the evidence;

b. Denied receiving payments they actually received;

c. Neglected to obtain flood insurance; and

d. Received compensation from the government.

{¶164} "A new trial may be granted to all or any of the parties and on all or part of the issues upon * * * [m]isconduct of the jury." Civ.R. 59(A)(2).

{¶165} A trial court's ruling on a motion for new trial based on jury misconduct is reviewed under an abuse of discretion standard. *Grundy v. Dhillon*, 120 Ohio St.3d 415, 2008-Ohio-6324, 900 N.E.2d 153, ¶ 34.

{¶166} The Ohio Supreme Court has held: "Where an attorney is told by a juror about another juror's possible misconduct, the attorney's testimony is incompetent and may not be received for the purpose of impeaching the verdict or for laying a foundation of evidence *aliunde*." *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph two of the syllabus.

{¶167} As the only evidence of juror misconduct was incompetent, the trial court's denial of the Motion for Mistrial was not an abuse of discretion. *State v. Tarver*, 11th Dist. Portage No. 2011-P-0073, 2012-Ohio-4335, ¶ 44.

{¶168} The seventh assignment of error is without merit.

{¶169} Having found no merit in the plaintiffs' assignments of error, we need not consider the defendants' cross-assignment of error, raising alternative arguments for affirming the lower court's judgment. *Erickson v. Mgt. & Training Corp.*, 11th Dist. Ashtabula No. 2012-A-0059, 2013-Ohio-3864, ¶ 53.

{¶170} In their sole assignment of error on cross-appeal, the defendants argue the trial court erred in failing to sanction the plaintiffs for frivolous conduct.

{¶171} "[A]t any time not more than thirty days after the entry of final judgment in a civil action or appeal, any party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal."  R.C. 2323.51(B)(1).

{¶172} "Frivolous conduct" means, inter alia, conduct that "obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation"; "consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery"; or "consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief."  R.C. 2323.51(A)(2)(a)(i), (iii) and (iv).

{¶173} "An award * * * may be made against a party, the party's counsel of record, or both."  R.C. 2323.51(B)(4).

{¶174} "Although R.C. 2323.51 allows a trial court to award attorney fees incurred by a party subjected to frivolous conduct, the statute does not mandate such an award." *Papadelis v. Makris*, 8th Dist. Cuyahoga No. 84046, 2004-Ohio-4093, ¶ 8.

{¶175} A trial court's decision whether to award sanctions under R.C. 2323.51 will not be reversed absent an abuse of discretion.  *State ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, 957 N.E.2d 19, ¶ 11.  "[T]he statute does not require the court to hold a hearing when it determines, in its discretion, that the motion lacks merit." *Guerrieri v. Brys*, 7th Dist. Mahoning No. 13 MA 7, 2014-Ohio-1178, ¶ 11; *Papadelis* at ¶ 12.

39

{¶176} On February 19, 2013, the defendants filed their Motion for Sanctions for Frivolous Conduct and Multiple Violations of Civil Rule 11.

{¶177} On March 4, 2013, the trial court denied the Motion.

{¶178} The defendants based their motion for attorney fees on the failure of certain plaintiffs to appear for trial, the plaintiffs' concealment, alteration, and misrepresentation of evidence, and the plaintiffs' false attestation of photographic evidence.

{¶179} After a decade of litigation, several plaintiffs failed to appear for trial and/or appeared unaware of the claims they were making. The defendants note that plaintiffs, Douglas Bly, David Lough, Darlene DeBolt, Patricia Manges, and Dusty Lough did not testify at trial. Two of these plaintiffs, Darlene DeBolt and Patricia Manges, made claims of fraudulent concealment. Plaintiff, Dusty Wolfe, did testify at trial but was unaware that she was claiming fraud.

{¶180} With respect to evidence, the plaintiffs' claims were first raised in a class action lawsuit filed in June 2002 (Portage C.P. No. 2002 CV 0695), and in another lawsuit raising individual claims filed in November 2003 (Portage C.P. No. 2003 CV 1179). During the course of these lawsuits, plaintiffs represented that they produced in discovery copies of all photographs and receipts within their possession.

{¶181} On March 21, 2011, the defendants filed their Initial Discovery Requests in the present action.

{¶182} The plaintiffs responded, on August 15, 2011, by seeking a Joint Motion for Protective Order regarding Defendants' Initial Discovery Requests. The justification for the protective order was that, "[s]ince discovery had concluded in Case No. 2003 CV

40

01179," the defendants' present discovery requests were unnecessarily "annoying and burdensome."

**{¶183}** On the same date, the plaintiffs moved the trial court for a Case Management Order, "[a]dopting all pretrial discovery orders in consolidated Case Nos. 2002 CV 0695 and 2003 CV 1179," and "[l]imiting additional discovery to claims, defenses, and events applicable in the present action."

**{¶184}** On November 2, 2011, the trial court issued separate Orders and Journal Entries, ruling that "[a]ll discovery filed or exchanged in the original action is incorporated by reference into this action," and, with certain requests for admissions excepted, that "plaintiffs [are] to respond to all other discovery requested by the Defendants."

**{¶185}** In response to defendants' discovery requests, the plaintiffs individually asserted: "I stand behind the discovery previously provided without supplementation," including documentary evidence and photographs.

**{¶186}** During the course of the litigation, defendants became aware that the plaintiff Jason DeBolt had altered certain documents (receipts) evidencing damages.

**{¶187}** On April 30, 2012, after the plaintiffs refused the defendants access to the original documents and photographs, defendants filed a Motion to Compel. The plaintiffs opposed the motion, arguing in response that "Jason [DeBolt] will swear that <u>no</u> exhibit was knowingly changed or intentionally altered," and asking for sanctions against the defendants.

**{¶188}** On May 21, 2012, the trial court issued an Order and Journal Entry, granting "Defendants request to inspect original receipts, documents, pictures in possession of Plaintiffs (or Plaintiffs['] Attorney)."

{¶189} Defendants' subsequently learned of additional receipts in which Jason DeBolt had altered the date to correspond to a particular flood event. The alterations were more readily apparent upon inspection of the original receipts. Defendants also learned that the plaintiffs possessed additional documents that had not been produced in discovery. Defendants also learned that certain photographic exhibits had been misidentified. The back of the original photographs demonstrated that the photographs had been developed before the flood events they purported to depict.

{¶190} Finally, during the course of the trial, virtually every plaintiff who testified equivocated about the dates of flood events and/or the authenticity of photographs previously attested to in deposition testimony and/or responses to discovery requests.

{¶191} We find the trial court's decision not to make an award of sanctions to be a reasonable exercise of its discretion. We emphasize that "[c]ourts must carefully apply R.C. 2323.51 'so that legitimate claims are not chilled.'" (Citation omitted.) *State ex rel. Verhovec v. Marietta*, 4th Dist. Washington Nos. 11CA29, et al., 2013-Ohio-5414, ¶ 47. "A party is not frivolous merely because a claim is not well-grounded in fact," and "the statute was not intended to punish mere misjudgment or tactical error." (Citation omitted.) *Ohio Power Co. v. Ogle*, 4th Dist. Hocking No. 12CA14, 2013-Ohio-1745, ¶ 29. This court has expressly held that "R.C. 2323.51 requires a finding of malicious conduct or that the pleading was brought with no basis in existing law or a good faith basis for the modification of existing law." *Teter v. Rossi*, 11th Dist. Trumbull No. 2001-T-0103, 2002-Ohio-4818, ¶ 35.

{¶192} In the present case, the plaintiffs' claims had some legitimate legal and factual basis inasmuch as the defendants were under a duty to "ensure that the manufactured home park site * * * is well drained and is not subject to recurring

42

flooding," Ohio Adm.Code 3701-27-07(A), and that they themselves admitted to the occurrence of damaging flood events. Moreover, the plaintiffs' allegedly frivolous conduct may be considered negligent, rather than malicious, in character. As such, the decision to award or deny attorney fees was within the trial court's discretion and this court may not substitute our judgment for that of the lower court.

{¶193} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas, entering judgment in favor of the defendants while denying the defendants' motion for sanctions, is affirmed. Costs to be taxed against the parties equally.


COLLEEN MARY O'TOOLE, J., concurs,

TIMOTHY P. CANNON, P.J., concurs in part and dissents in part with a Concurring/Dissenting Opinion.


_____


TIMOTHY P. CANNON, P. J., concurring in part and dissenting in part.

{¶194} I respectfully concur in part and dissent in part from the opinion of the majority.

{¶195} I agree with the majority opinion affirming the decision of the trial court with regard to appellants' assignments of error. Appellees have presented what they refer to in the first portion of their brief as a cross-assignment of error; yet, this is in fact an assignment of error on cross-appeal as it seeks to change the lower court's judgment. Appellees contend the trial court erred in denying "P&M Estates' motions for

43

sanctions for frivolous conduct under R.C. 2323.51 and Civ.R. 11 or, at minimum, erred in failing to hold an evidentiary hearing on the issues raised in P&M Estates' motions." The cross-assignments of error that appear later in the brief do not seek to change a ruling from the trial court, but are offered as alternate support for the trial court's judgment, pursuant to R.C. 2505.22 and App.R. 3(C)(2).

{¶196} I dissent from the portion of the majority opinion that found no merit in appellees' assignment of error on cross-appeal.

{¶197} Litigation is a difficult and expensive venture. The duty of an attorney not to engage in frivolous conduct is clearly set forth in Rule 3.1 of the Ohio Rules of Professional Conduct. In addition, there are very clear obligations set forth in Rule 3.3 regarding representations to the tribunal:

> (a) A lawyer shall not *knowingly* do any of the following:
>
> (1) make a false statement of fact or law to a *tribunal* or fail to correct a false statement of material fact or law previously made to the *tribunal* by the lawyer;
>
> * * *
>
> (3) offer evidence that the lawyer *knows* to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to *know* of its falsity, the lawyer shall take *reasonable* measures to remedy the situation, including, if necessary, disclosure to the *tribunal*. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer *reasonably believes* is false.
>
> (b) A lawyer who represents a client in an adjudicative proceeding and who *knows* that a person, including the client, intends to engage, is engaging, or has engaged in criminal or *fraudulent* conduct related to the proceeding shall take *reasonable* measures to remedy the situation, including, if necessary, disclosure to the *tribunal*.

44

{¶198} In appellees' motion for sanctions, they set forth a clear pattern of conduct that should not, and cannot, be tolerated in our system of justice.

{¶199} Appellees' allegations detailed how appellants' counsel deliberately and continually labored to thwart the discovery process. One glaring example is what occurred when appellees' counsel wanted to view original receipts and photographs due to the suspicion that the copies had been altered. This is something counsel is clearly entitled to, and the merit of the request cannot reasonably be debated. Appellants' counsel refused to allow the examination, forcing appellees' counsel to file a motion to compel. Appellants' counsel opposed the motion, contending that one of his clients will swear the exhibits were not altered. The trial court granted the motion to compel.

{¶200} Even though the parties and counsel are all located in northeast Ohio, appellants' counsel indicated he would arrange for a supervised inspection of the original exhibits at his office in Louisville, Kentucky. Appellees' counsel accepted the offer. The next day, however, counsel for appellees withdrew the offer to allow inspection, prompting the need for defendants to file another motion to compel.

{¶201} The trial court issued an order requiring production of the original materials "on or before June 1, 2012." The day before the inspection, an "Affidavit of Records Custodian" was delivered to appellees' counsel. The affidavit was from the wife of appellants' counsel, in her capacity as a paralegal. The affidavit indicates, "some of the files have been destroyed in accordance with applicable record retention laws." There are no laws allowing the destruction of original documents that have been identified as exhibits or that are otherwise relevant with regard to pending litigation.

{¶202} Appellees' counsel also detailed in the motion many alleged instances of falsified documents and perjured testimony. I agree that we should generally defer to

45

the trial court with regard to imposition of sanctions; however, when the allegations are this serious and appear to be supported by the record, the trial court, at a minimum, must afford the offended party a hearing to establish its claims.

{¶203} The type of behavior alleged in the motion cannot be condoned or justified and cannot be tolerated. Accordingly, I believe it was an abuse of discretion on the part of the trial court in failing to conduct a hearing to determine the extent of the involvement by the parties and counsel; the appropriate scope to consider; and the appropriate sanctions, if any, to award.

{¶204} I find merit in the error assigned on cross-appeal.